# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SHEILA A. MCFARLAND, | ) | Case No. 1:21-cv-01141 |
| | ) | |
| Petitioner, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Darrell A. Clay |
| | ) | |
| TERI BALDAUF, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## OPINION AND ORDER

Petitioner Sheila McFarland, a prisoner in State custody serving a sentence of life in prison, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Magistrate Judge recommends denying and dismissing Ms. McFarland's claims. Petitioner objects to that recommendation.  For the following reasons, the Court **OVERRULES** Petitioner's objections, **ADOPTS** the Magistrate Judge's Report and Recommendation, and **DENIES** and **DISMISSES** the petition for a writ of habeas corpus.  Further, the Court **DENIES** a certificate of appealability.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2015, Robert Williams and his girlfriend, Korri Henderson, acting as confidential informants, assisted law enforcement with the arrest of their drug suppliers, Eddie Brownlee, and Brownlee's girlfriend, Sheila McFarland.  (ECF No. 15-1, ¶ 4, PageID #294–95.)  Ms. McFarland was released from jail shortly after her arrest, while Brownlee remained in custody.  (*Id.*, PageID #295.)

### A.    The Murder of Robert Williams

While detained, Brownlee had several phones calls, which were recorded, with Ms. McFarland.  (*Id.*, ¶ 5.)  During one call, Brownlee told Ms. McFarland and his friend Ryan Motley that Williams snitched and that he (Brownlee) was going to "get him [Williams]."  (*Id.*, ¶ 33, PageID #445.)  On the call, Ms. McFarland made clear that she had prior conversations with Motley about the firearm that would become the murder weapon.  (*Id.*)  Motley later testified that Ms. McFarland texted him regarding "their" gun, in reference to Brownlee and McFarland.  (*Id.*)  Brownlee ordered Motley to "[g]et Rob.  Get those motherf*ers."  (*Id.*, ¶ 6, PageID #378–79.)

In another call, Ms. McFarland told Brownlee that she told Motley that Williams would "have to be handled" and that "something got to be done."  (*Id.*, ¶ 34, PageID #445.)  Also, Ms. McFarland left two voicemails on Henderson's phone, accusing her and Williams of being snitches.  (*Id.*, ¶ 48, PageID #451.)

### A.1.    Planning the Murder

Ms. McFarland and Motley sold drugs to raise bail money to get Brownlee released from jail on November 10, 2015.  (*Id.*, ¶ 34, PageID #445.)  Shortly after, the three met in a hotel room, where Brownlee discussed taking action against Williams.  (*Id.*, ¶ 35, PageID #445–46.)

Henderson testified that the night before the murder, Brownlee called and threatened her and Williams, stating "I'm coming for you" and warning that they would "see their graves."  (*Id.*; *id.*, ¶ 10, PageID #296–97.)  That evening, a truck appeared at Williams's apartment complex, and the occupants watched their apartment unit.  (*Id.*, ¶ 10, PageID #296–97.)  Henderson reported the incident to the

police. (*Id.*) She and Williams stayed with someone else until morning. (*Id.*, ¶ 35, PageID #446.) On the morning of the murder, Ms. McFarland called Henderson, who told her that Brownlee had been making threatening calls to Williams. (*Id.*) Ms. McFarland denied that Brownlee made the calls, claiming that she had been with him all night. (*Id.*) After the call, Henderson and Williams returned to their apartment. (*Id.*)

### A.2.    The Murder

On November 14, 2015, Ryan Motley and two other codefendants—his brother, Raymond Motley, and a friend, Rahkee Young—drove to Williams's residence. (*Id.*, ¶ 14, PageID #298.) Surveillance footage captured Williams leaving his apartment and walking down the hallway as Ryan Motley and Young emerged from hiding and approached him. (*Id.*, ¶ 51, PageID #452.) After a brief confrontation, Ryan Motley fired a single close-range shot, killing Williams, before they fled. (*Id.*, ¶ 14, PageID #298.) Ryan Motley testified that he taped over the peepholes of nearby apartments to block neighbors' views, but DNA tests later matched the tape to his brother. (*Id.*, ¶ 12, PageID #297.)

Later that evening, Ryan Motley called Brownlee and said "[i]t's done." (*Id.*, ¶ 36, PageID #446.) After the murder, Ryan Motley, Raymond Motley, and Young met Brownlee and Ms. McFarland at their hotel, where Brownlee paid Ryan Motley with drugs. (*Id.*, ¶ 52, PageID #453.)

### B.    Conviction in State Court

On March 18, 2016, a grand jury indicted Sheila McFarland and four co-defendants on ten charges related to the murder of Robert Williams. (ECF No. 15-1,

3

PageID #147–57.)  Ryan Motley, Raymond Motley, and Young accepted plea deals and testified against Brownlee at trial in State court.  (*Id*., ¶ 19, PageID #299.)  Ryan Motley testified against Ms. McFarland at her trial as well.  (*Id*.)  On February 10, 2017, a jury convicted Ms. McFarland of all ten charges, which included multiple counts of aggravated murder (Count 1 and Count 2), conspiracy (Count 3), murder (Count 4 and Count 5), felonious assault (Count 6 and Count 7), aggravated burglary (Count 8 and Count 9), and kidnapping (Count 10), as well as firearm specifications.  (*Id.*, PageID #184.)

### B.1.   Sentencing Hearing

At the sentencing hearing, the State trial court judge and Ms. McFarland engaged in a tense exchange that increasingly escalated.  (ECF 15-6, PageID #1314–29.)  The judge criticized Ms. McFarland for rejecting a plea deal, stating "[s]o twice you were given the opportunity to enter into a guilty plea, accept responsibility, demonstrate some remorse.  In both instances, you refused to do that."  (*Id.*, PageID #1316.)  While the jury deliberated, prosecutors offered another plea deal, which Ms. McFarland also declined.  (*Id.*)  The judge commented that Ms. McFarland rejected a plea because "apparently, your attorneys told me that you, quote, made your peace with God, closed quote.  Well, now you have to make your peace with the state of Ohio.  Okay?"  (*Id.*)  Under the plea deal, Ms. McFarland could have received as little as three years in prison.  (ECF No. 1, PageID #14.)

During the hearing, Ms. McFarland interrupted a victim's representative and the judge to assert her innocence and declined to speak during an opportunity for allocution, claiming her cases were "rigged."  (ECF No. 15-6, PageID #1322.)  Also,

4

she accused the judge of racism.  (*Id.*, PageID #1323–24.)  In response, the judge commented on defendants who "get indicted for obvious crimes that they know they are going to get busted for," who are "so self-destructive that they continue to exhibit Sheila's attitude" and "flip the script."  (*Id.*, PageID #1324.)  Further, he observed that such defendants "blame the system.  They blame the cops.  They blame the prosecutors.  Of course they blame the judge."  (*Id.*)  Ms. McFarland responded that "[i]t's all over that you racist.  It's on the computer."  (*Id.*)  The judge responded:

> Right.  Right.  So then what Sheila does is, she not only rejects the plea bargain . . . Then she files a grievance against [her attorney] . . . Then she filed a grievance against me, which was dismissed by the supreme court already . . . then Eddie Brownlee filed a grievance against me and wrote me and told me how unfair I was to everybody.  So they've exacerbated an aggravated murder.

(*Id.*, PageID #1324–25.)  Then, the judge told Ms. McFarland that she was "the most obnoxious outspoken one of the defendants.  You're even worse than Eddie Brownlee.  And as such, I'm going to hand down the penalty . . . that I want to ring out across the state of Ohio and across this country."  (*Id.*, PageID #1325–26.)  Before providing the sentence, the judge said:

> When you try to flip the script, when you play the race card in a disgusting fashion, but, most importantly, when you manipulate the system of justice by murdering a witness in a criminal trial, you will pay for it with the harshest possible penalty.

(*Id.*, PageID #1326.)

### B.2.   The Sentence

The court merged Counts 1 through 7 and sentenced Ms. McFarland on Count 1 (aggravated murder) to imprisonment for life without the possibility of parole, with an additional three years for the firearm specification.  (ECF No. 15-1, PageID

#186–87.)  Further, the court merged Counts 8 and 9 and sentenced Ms. McFarland on Count 8 (aggravated burglary) to 11 years in prison.  (*Id.*)  In addition, the State trial court sentenced Ms. McFarland on Count 3 (conspiracy) to 11 years.  (*Id.*)  Finally, the State trial court sentenced Ms. McFarland on Count 10 (kidnapping) to 11 years of imprisonment, merging the firearm specification with the one for Count 1.  (*Id.*)  The court imposed a $20,000 fine.  (*Id.*)

The judge declined to speak to Ms. McFarland about post-release control, stating "[y]ou'll never be released, so I'm not going to talk to you about post-release control."  (ECF No. 15-6, PageID #1326–27.)  He informed Ms. McFarland of her right to appeal and her right to a court-appointed attorney if she could not afford one.  (*Id.*, PageID #1327.)  Finally, the judge noted that he was:

> statutorily required to tell you if you don't have the funds to pay for a transcript, we'll provide a transcript for you.  But since you've asked me not to do anything for you, I will not order the transcript for you until you personally write me and apologize for your obnoxious behavior in this courtroom today.

(*Id.*, PageID #1328.)  Ms. McFarland's attorney requested the transcript and objected to her sentence.  (*Id.*, PageID #1328–29.)

### C.  Direct Appeal

On March 10, 2017, Ms. McFarland filed a *pro se* petition for post-conviction relief and a motion for summary judgment in State court, which were both denied. (ECF No. 15-1, PageID #188–96.)

On March 15, 2017, Ms. McFarland appealed her conviction and sentence, raising five assignments of error.  (*Id.*, PageID #197–228.)  Later, she filed a supplemental brief, asserting two additional assignments of error.  (*Id.*, PageID

6

#265.)   On May 24, 2018, the State appellate court upheld Ms. McFarland's convictions but remanded for resentencing, ordering the merger of the kidnapping count with the aggravated murder count.  (*Id.*, PageID #316; *State v. McFarland*, 2018-Ohio-2067, ¶ 50 (Ohio Ct. App.) ("*McFarland I*").)  The State appellate court denied Ms. McFarland's motion for reconsideration.  (ECF No. 15-1, PageID #334.)

On August 13, 2018, Ms. McFarland appealed to the Ohio Supreme Court, arguing that the evidence was insufficient to support her convictions and that the maximum sentence was based on her behavior at sentencing rather than the appropriate punishment for the offense.  (*Id.*, PageID #338.)  The Ohio Supreme Court accepted discretionary review on the former to determine whether the evidence was sufficient to support the convictions.  (*Id.*, PageID #354.)   On June 18, 2020, the Supreme Court of Ohio affirmed the Eighth District's judgment after determining that sufficient evidence supported the four counts on which Ms. McFarland was sentenced—aggravated murder, conspiracy, aggravated burglary, and kidnapping. (*Id.*, PageID #376–95; *State v. McFarland*, 162 Ohio St. 3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 53 ("*McFarland II*").)  The Ohio Supreme Court denied reconsideration. (ECF No. 15-1, PageID #400.)

### D.    Resentencing and Post-Conviction Petition

On March 3, 2022, the State trial court resentenced Ms. McFarland and merged the kidnapping count with the aggravated murder count.  (ECF No. 25, PageID #1382.)  The State elected to proceed on Count One, aggravated murder.  (*Id.*) The State trial court resentenced Ms. McFarland to life in prison with eligibility for parole after 20 years, plus an additional three years for the firearm specification.  (*Id.*)

7

At the resentencing, the judge (the same one who presided at trial and previously sentenced her) noted that someone posted Ms. McFarland's outburst from the original sentencing on YouTube, stating "[s]o as far as YouTube is concerned," the trial judge "is a racist."  (Resentencing Tr., No. CR-16-604052-B at 5 (attached as Exhibit 1).)  A podcast covering Cuyahoga County's criminal justice system was being produced at that time.  (*Id.*)  The judge remarked on how the podcast summarized Ms. McFarland's case:

> They summarize the Sheila McFarland case by saying:  Judge Gaul—and by the way, they're saying this with dramatic music playing in the background and the narrator is whispering in a soundproof room into a microphone the following:  Quote, Judge Gaul sentenced a black woman to life in prison after she accused him of being a racist, closed quote. Period.  End of paragraph, end of chapter, and on to something completely different.  And they never put into context Sheila's sentencing and the fact that a person was murdered, that a State's witness was murdered, that she was offered a plea bargain, or that she eventually apologized to the trial court judge . . . .  You know, I know when people are going through the criminal justice system, they're upset and I know your life changes because you've just been convicted.  I know you're upset.  That's why I can accept Sheila's apology.  I don't have any problem with it at all.

(*Id.* at 6–7.)  He went on to explain: "the only reason I put this on the record is it just goes to show you how vicious and predatory and unfair some of these media people can be." (*Id.* at 7.)  The judge continued:

> And so, yeah, I've taken some—some hits.  And what's really fascinating to the Court is that some really smart people—you know, some people, some people that maybe even are attorneys and some people that maybe are even positions of authority within the profession somehow after listening to this podcast believe that there's any truth to it.

(*Id.* at 7–8.)  He reiterated that he "wanted to let it be known that [he] certainly harbor[ed] no grudge against Sheila McFarland."  (*Id.* at 8.)

8

Then, the judge went on to discuss the plea bargains Ms. McFarland declined and how he "would have preferred if Sheila had exercised that option because I believe that that sentence more appropriately reflects her involvement in this case." (*Id.* at 9.)  Before formally resentencing Ms. McFarland, the judge accepted Ms. McFarland's apology, stating "I understand where you were coming from.  I hold no grudges." (*Id.*) Then, he offered to recuse if Ms. McFarland thought he was biased or prejudiced. (*Id.* at 9–10.)  Through counsel, she declined the offer (*id.* at 10), then the judge resentenced her (*id.* at 18).

Ms. McFarland appealed, and ultimately the Ohio Supreme Court declined review. *State v. McFarland*, 171 Ohio St. 3d 1445, 2023-Ohio-3444, 218 N.E. 3d 951 (2023) (table).

### E.    Post-Conviction Petition and Habeas Proceedings

On August 12, 2021, before resentencing, Ms. McFarland sought leave to file a motion for a new trial.  (ECF No. 15-1, PageID #490–91.)  After resentencing, the State trial court denied the motion.  (*Id.* at 492; ECF No. 25, PageID #1383–84.) Ms. McFarland appealed for a *nunc pro tunc* entry, arguing that her motion for a new trial constituted a live collateral appeal and was not moot.  (ECF No. 25, PageID #1384.)  The State appellate court affirmed the trial court's decision.  *State v. McFarland*, 2022-Ohio-4638, ¶ 29 (Ohio Ct. App.).  Then, Ms. McFarland appealed to the Ohio Supreme Court, which declined review.  (ECF No. 25, PageID #1383.)  On November 28, 2023, the State trial court issued a *nunc pro tunc* order stating that her motion for a new trial was not moot.  (*Id.*)

9

Ms. McFarland sought to reopen her motion for a new trial, which the State appellate court denied on January 5, 2024.  *State v. McFarland*, 2024-Ohio-60, ¶ 7 (Ohio Ct. App.).  Apparently, Ms. McFarland did not appeal this decision.

### E.1.   Petition for a Writ of Habeas Corpus

On June 4, 2021, Ms. McFarland filed a petition for a writ of habeas corpus, asserting six grounds for relief.  As relevant here, her petition raised claims for sufficiency of the evidence (ground two) and vindictive sentencing (ground four).  She also raised claims for relief based on the testimony of Dwayne Jackson (ground one); sentencing on allied offenses (ground three); the jury instructions (ground five); and ineffective assistance of trial and appellate counsel (ground six).  (ECF No. 1, PageID #7–19; ECF No. 25, PageID #1373–74.)

### E.2.   Report and Recommendation

In his Report and Recommendation, the Magistrate Judge recommended that the Court deny the petition.  (ECF No. 25, PageID #1420.)  In making this recommendation, the Magistrate Judge reviewed the factual and procedural background of Petitioner's conviction and subsequent proceedings in the State courts.  (*Id.*, PageID #1374–85.)  Further, the Magistrate Judge recommended that the Court deny a certificate of appealability.  (*Id.*, PageID #1419.)

### E.2.a. Merits (Ground Two & Ground Four)

The Magistrate Judge determined that Petitioner's second ground for relief that the evidence was insufficient to support the guilty verdicts lacked merit because it failed to overcome the double deference that applies to habeas petitions.  (*Id.*, PageID #1394.)  Specifically, the Magistrate Judge addressed how Petitioner's claim

10

did not survive review under the standards set out in *Jackson v. Virginia*, 443 U.S. 307, 326 (1979), and the Antiterrorism and Effective Death Penalty Act of 1996.

Next, the Magistrate Judge determined that Petitioner's fourth ground for relief that the State trial court allegedly imposed a sentence of life without the possibility of parole to punish her for her behavior at the sentencing hearing was not cognizable and without merit in any event. (*Id.*, PageID #1405.) The Magistrate Judge construed Petitioner's claim as a vindictive sentencing claim and determined that Petitioner had not identified Supreme Court precedent permitting such a claim where, as here, the State trial judge imposed a harsher sentence than the one available through a plea that was offered but rejected. (*Id.*, PageID #1406–07.)

After reviewing the sentencing transcript, the Magistrate Judge determined that Petitioner's fourth ground for relief lacked merit in any event. (*Id.*, PageID #1407–11.) He reasoned that there was no vindictive sentence because Petitioner's sentence was the result of her choice to proceed with trial rather than accept the benefits of a plea agreement. (*Id.*, PageID #1409.) Further, the Magistrate Judge determined that the State trial judge indicated that Petitioner's sentence was in relation to her involvement with the murder of a witness, within his discretion, and not disproportionate to the crime. (*Id.*, PageID #1410–11.)

### E.2.b. Non-Cognizable Claims (Grounds Three & Five)

The Magistrate Judge determined that Petitioner's third ground for relief—that the State trial court committed error when it sentenced Petitioner on charges of aggravated murder, conspiracy, aggravated burglary, and kidnapping when they are all allied offenses of similar import—was not cognizable in federal habeas corpus.

11

(*Id.*, PageID #1411.)  He reasoned that this sentencing issue arose under State law, specifically Section 2941.25 of the Ohio Revised Code.  (*Id.*, PageID #1412.)  Further, the Magistrate Judge determined that any double jeopardy argument was waived, but such an argument would nonetheless fail due to the deference federal courts must give to State court determinations that State law intends multiple punishments for a single criminal incident.  (*Id.*, PageID #1413.)

Next, the Magistrate Judge determined that Petitioner's fifth ground for relief on the basis of an erroneous jury instruction was not cognizable in federal habeas corpus.  (*Id.*, PageID #1414.)  The Magistrate Judge arrived at this determination because Petitioner asserted an error of State law and did not demonstrate that the jury instruction at issue infected the entire trial to constitute a violation of due process in the resulting conviction.  (*Id.*, PageID #1415.)

### E.2.c. Procedurally Defaulted Claims (Grounds One & Six)

Finally, the Magistrate Judge determined that Petitioner's first and sixth grounds for relief were procedurally defaulted.  (*Id.*, PageID #1416.)  The Magistrate Judge reasoned that Petitioner's first ground for relief—that the State trial court improperly refused to allow a witness to answer a question about whether his testimony was directed by the prosecution—was not raised again after direct appeal.  (*Id.*, PageID #1417.)

The Magistrate Judge also reasoned that Petitioner's sixth ground for relief—that she had ineffective assistance of counsel at the trial and appellate level—was procedural defaulted.  (*Id.*, PageID #1418.)  The Magistrate Judge determined that Petitioner's claim for ineffective assistance of trial counsel was not raised again after

12

direct appeal with the Eighth District.  (*Id.*)  Further, the Magistrate Judge determined that Petitioner's claim for ineffective assistance of appellate counsel was not raised when she sought to reopen her motion for a new trial.  (*Id.*)

### E.3.   Objections

Petitioner timely objected to the Report and Recommendation.  (ECF No. 28.) In her objection, Petitioner only specifically objected to the Magistrate Judge's determinations regarding her second ground for relief regarding the sufficiency of the evidence.  (*Id.*, PageID #1427.)  Petitioner argues that the Magistrate Judge's evaluation of ground two on its merits ignores "the reasonableness of the actual analysis and factual interpretation done by the state court."  (*Id.*, PageID #1436.) Petitioner contends that such an analysis improperly allows "the absence of evidence to justify a finding of sufficient evidence" and permits "an unreasonable Jackson analysis based on factual interpretations not supported by the trial court record." (*Id.*)

## STANDARD OF REVIEW

A district court judge may direct a Magistrate Judge to submit "proposed findings of fact and recommendations for the disposition, by a judge of the court," 28 U.S.C. § 636(b)(1)(B), of a petition for a writ of habeas corpus, which the Court does by Local Rule, *see* L.R. 72.2.  When reviewing a report and recommendation, if a party objects within the allotted time, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which the objection is made."  28 U.S.C. § 636(b)(1)(C); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  Objections must be specific,

not general, and should direct the Court's attention to a particular dispute.  *Howard v. Secretary of Health & Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991).  "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute."  *Thomas v. Arn*, 474 U.S. 140, 147 (1985).

On review, the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge."  28 U.S.C. § 636(b)(1)(C).  Importantly, the Court's job is not to conduct a free-wheeling examination of the entire report and recommendation, but only to address any specific objections that a party has advanced to some identified portion of it.  Accordingly, it is the Court's task in this matter to review the Magistrate Judge's report and recommendation de novo, based on the specific objections that Petitioner raises.

## ANALYSIS

Where a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States," he is entitled to a writ of habeas corpus.  28 U.S.C. §§ 2241(c)(3) & 2254(a).  The writ tests the fundamental fairness of State court proceedings resulting in the deprivation of an individual's liberty.  *See, e.g.*, *Brown v. Allen*, 344 U.S. 443, 463 (1953); *Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000).  28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted

14

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"With the AEDPA, Congress limited the source of law for habeas relief to cases decided by the United States Supreme Court." *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A State court adjudication is "contrary to" Supreme Court precedent under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams*, 529 U.S. at 405. "Avoiding these pitfalls does not require citation of [Supreme Court] cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Under Section 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Williams*, 529 U.S. at 410). A State court adjudication involves "an unreasonable application of" Supreme Court precedent under Section 2254(d)(1) in one of two ways: (1) if the State court identifies the correct governing legal rule from the Supreme Court's cases[,] but unreasonably applies it to the facts

15

of the particular State prisoner's case; or (2) if the State court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *See Williams*, 529 U.S. at 407.

## I.    Sufficiency of the Evidence (Ground Two)

Under the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 326 (1979), "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Under this standard, "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.

The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).  First, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).  Second, under the AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the State court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  *Id.* (quoting *Cavazos*, 565 U.S. at 2.)

16

Federal habeas courts "do not weigh the evidence presented, consider the credibility of witnesses, or substitute [their] judgment for that of the jury." *United States v. Geisen*, 612 F.3d 471, 488–89 (6th Cir. 2010) (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999)).  Further, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68.  "Consequently, in raising a sufficiency of the evidence claim, a defendant 'bears a very heavy burden.'" *Id.* (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999).  The Court "has a duty to assess the historic facts" when called on to apply a constitutional standard to a State court conviction.  *Jackson,* 443 U.S. at 318.

## I.A.  Complicity

In her objection, Petitioner contends that the Magistrate Judge "ignored that the Ohio Supreme Court, in its own words only analyzed whether there was sufficient evidence for the crime's *sentence*."  (ECF No. 28, PageID #1429.)  Petitioner's argument does not take issue with the Ohio Supreme Court's analysis of her sentence, but its analysis of the four counts of her conviction.  (*Id.*, PageID #1429–36.)  She argues that the State courts failed to consider the elements of the charged crimes, resulting in an improper application of the *Jackson* standard.  (*Id.*, PageID #1436.)  This objection focuses on the conspiracy charge and raises no objection to the complicity findings of either the State courts or the Magistrate Judge.  (*Id.*, PageID #1429.)

The State court began its analysis by focusing on complicity.  *McFarland II*, 2020-Ohio-3343, ¶ 26.

### I.A.1. Elements of Complicity

Ohio law on complicity requires, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:  (1) Solicit or procure another to commit the offense; (2) Aid or abet another in committing the offense; (3) Conspire with another to commit the offense."  Ohio Rev. Code § 2903.03(A).  "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender."  Ohio Rev. Code § 2923.03(F).  Further, the United States Supreme Court has determined that a defendant may be convicted as an aider and abettor without proof of involvement in every element of the offense.  *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (determining that a defendant who helps bring about one part of an offense necessarily helped to complete the whole).  Because Petitioner was not the principal offender, the jury—and the State courts on review—had to determine whether she was complicit in the crimes charged to the same extent as a principal actor.

### I.A.2. State Court Adjudication

Based on the record, the Ohio Supreme Court focused on whether the evidence of Ms. McFarland's participation in the crimes sufficed for criminal liability on a complicity theory.  *McFarland II*, 2020-Ohio-3343, ¶ 26.  In this respect, the question did *not* turn on the formalities.  That is, Ms. McFarland was not charged with complicity; instead, she was charged as a principal offender under Section 2929.03.  Still, the Ohio Supreme Court recognized that Ms. McFarland might still be guilty of the principal offense of aggravated murder if her participation in the offense satisfied

18

the requirements for complicity. *Id.* at ¶ 28 (citing *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 32).

After reviewing the record, the Ohio Supreme Court determined that Ms. "McFarland purposely and with prior calculation and design caused the death of Williams or aided or abetted those who did by facilitating the commission of aggravated murder or by actively promoting it. She supported, assisted, encouraged, cooperated with, advised, and incited Brownlee and Motley in the planning and commission of the crime." *Id.* at ¶ 40. To support this determination, the Ohio Supreme Court referenced several of Ms. McFarland's actions, including her discussion of revenge with Brownlee during their phone call while he was in jail, the threatening phone call she made to Henderson hours before the murder, her presence at the meeting to plan the murder, and the firearm (which became the murder weapon) that she shared with Brownlee. *Id.* at ¶¶ 32 & 39.

Viewing the evidence in the light most favorable to the prosecution, the Court determines that a rational trier of fact could find from any of these actions that Ms. McFarland was complicit in the primary offenses. *Jackson*, 443 U.S. at 319. Therefore, sufficient evidence supports the jury's verdict, and the Ohio Supreme Court's application of *Jackson* was not objectively unreasonable.

### I.B. Conspiracy

After its analysis of complicity, the Ohio Supreme Court turned to Ms. McFarland's conviction for conspiracy to commit aggravated murder. *McFarland II*, 2020-Ohio-3343, ¶ 43.

19

### I.B.1. Elements of Conspiracy

For a conspiracy to commit aggravated murder or murder, Ohio law requires, in relevant part, that "[n]o person, with purpose to commit or to promote or facilitate the commission of aggravated murder [or] murder . . . shall do either of the following:" (1) plan or aid in planning a murder; or (2) agree with another to engage in conduct facilitating the offense.  Ohio Rev. Code § 2923.01(A).  Further, "[n]o person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy."  *Id.* § 2923.01(B).

### I.B.2. State Court Adjudication

The Ohio Supreme Court thoroughly examined the evidence supporting Petitioner's conspiracy conviction under the *Jackson* standard.  *McFarland II*, 2020-Ohio-3343, ¶¶ 43–49.  After establishing from its complicity analysis that the evidence was sufficient to prove that Ms. McFarland "aided in planning or agreed that Motley would murder Williams," the Ohio Supreme Court addressed whether Ms. McFarland took "a substantial overt act in furtherance of the conspiracy."  *Id.* at ¶ 44 (citing Ohio Rev. Code § 2923.01(B)).  The State identified three overt acts to support the conspiracy charge:  "(1) solicitation of Motley for murder, (2) providing or assisting Motley in procuring the firearm, and (3) threatening Williams and/or Henderson via a telecommunications system."  *Id.* at ¶ 45.  But the jury only needed to find one to support the conviction.  Ohio Rev. Code § 2923.01(B).

20

### I.B.2.i. Solicitation

As to the first overt act the State put forward, the Ohio Supreme Court concluded that "a juror could find beyond a reasonable doubt that McFarland solicited Motley to commit murder." *McFarland II*, 2020-Ohio-3343, ¶ 46.  To make this determination, the Ohio Supreme Court relied on Ms. McFarland's role as "the conduit for information" between Brownlee and Ryan Motley, her jail calls referencing the need to "handle" Williams, and her presence at meetings during which the decision to harm Williams was made and when Brownlee met with the assailants after the murder. *Id.* Similar to the actions that supported the finding of complicity, these facts justify a rational finder of fact in its finding of guilt.  Therefore, the Ohio Supreme Court's determination was not objectively unreasonable. *Jackson,* 443 U.S. at 319.

### I.B.2.ii. Assistance in Obtaining the Firearm

Petitioner argues that the conspiracy conviction was based solely on Petitioner's failure to return a jointly owned firearm.  (ECF No. 28, PageID #1429.) But Petitioner mischaracterizes the State courts' adjudication and the evidence presented to the jury.  For the second overt act, the Ohio Supreme Court cited evidence that Motley referred to the firearm as "their" gun, referring to Brownlee and Ms. McFarland. *McFarland II*, 2020-Ohio-3343, ¶ 47. Further, Ms. McFarland knew that Motley retrieved the gun from her and Brownlee's hotel room. *Id.* Ultimately, Motley used this gun to murder Williams. *Id.* Based on these facts, a rational finder of fact could find that Ms. McFarland assisted Motley in obtaining the murder

21

weapon, and the State courts' adjudication upholding Ms. McFarland's conviction on this basis is not unreasonable.  *Jackson,* 443 U.S. at 319.

### I.B.2.iii. Threatening Communications

Petitioner does not address the third overt act alleged—threatening the victim and his girlfriend.  *McFarland II*, 2020-Ohio-3343, ¶ 48.  At trial, the prosecution presented voicemail messages from the day after Ms. McFarland's release from jail in which she cursed at Henderson, called her and Williams snitches, and implied that they caused Brownlee's arrest.  (ECF No. 15-3, PageID #759–63.)  The Ohio Supreme Court determined that a reasonable juror could find that the voicemails were threatening and "manifest[] a purpose on the part of the actor that the object of the conspiracy should be completed."  *McFarland II*, 2020-Ohio-3343, ¶ 48 (citing Ohio Rev. Code § 2923.01(B)).  In doing so, the State courts did not unreasonably apply *Jackson.*

\*     \*     \*

For these reasons, the Court's independent review of the record shows that the State courts correctly found that a rational jury could find guilt from the evidence presented.  *Keys v. Booker*, 798 F.3d 442, 452 (6th Cir. 2015) (citing *Jackson,* 443 U.S. at 319).  Further, the Court concludes that the State courts' application of review for the sufficiency of the evidence was not unreasonable on the record presented.

### I.C.   Absence of Evidence

Petitioner claims that the Ohio Supreme Court performed its analysis by "making inferences which could only be made if the fact-finder *disbelieved* uncontested evidence by the state's witness."   (ECF No. 28, PageID #1430.)

22

Specifically, Petitioner cites the Ohio Supreme Court's reasoning that the jury did not have to believe the testimony of Ryan Motley that "tried to diminish McFarland's involvement." *McFarland II*, 2020-Ohio-3343, ¶ 37. Petitioner contends that this language from the Ohio Supreme Court's decision supports her argument that the State court "unreasonably constructed a bizarre factual analysis." (ECF No. 28, PageID #1430.)

### I.C.1. Ryan Motley's Testimony

At trial, Motley made several attempts in his testimony to lessen Ms. McFarland's involvement in the conspiracy. *McFarland II*, 2020-Ohio-3343, ¶ 37. However, the Ohio Supreme Court observed that such attempts were met with prior statements that contradicted that testimony. *Id.* For example, the Ohio Supreme Court observed that, "regarding McFarland's statement that 'they' needed to be 'f[—]ed up,' Motley explained at trial that he understood that 'they' really meant Henderson only, but the state pointed out that Motley had written 'they' in his earlier statement." *Id.* Further, the Ohio Supreme Court observed that "Motley also testified that he had been in contact with McFarland about the location of one of Brownlee's firearms; however, in his written statement, he had referred to it as one of 'their' firearms." *Id.* Then, the Ohio Supreme Court noted that "Motley eventually admitted in his trial testimony that he had received a text message from McFarland about 'their' firearm." *Id.* From these facts, the Ohio Supreme Court determined that "[a] juror could have easily interpreted parts of Motley's testimony as trying to save McFarland from prosecution." *Id.*

23

Even outside of this context, the State confronted Motley at trial with prior inconsistent statements.  For example, Motley claimed that he placed tape over the peepholes near the murder scene.  (ECF No. 15-4, PageID #968).  But DNA and fingerprint evidence contradicted this testimony, linking the evidence to another co-defendant.  (ECF No. 15-5, PageID #1152–53.)  The Ohio Supreme Court noted that "the jury 'may believe or disbelieve any witness or accept part of what a witness says and reject the rest.'" *McFarland II*, 2020-Ohio-3343, ¶ 37 (quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548, 553 (1964)).  Petitioner claims that this determination represents "an unreasonable application of firmly established United States Supreme Court precedent," then proceeds not to cite any specific Supreme Court precedent.  (ECF No. 28, PageID #1430.)

On habeas review, the Court must assume that the factfinder resolved conflicting inferences in the prosecution's favor and defer to that resolution, even if the record does not explicitly so state.  *Jackson*, 443 U.S. at 326.  Therefore, the Ohio Supreme Court did not unreasonably apply *Jackson* to its analysis of Motley's testimony.

### I.C.2. The Ohio Supreme Court's Dissent

Petitioner argues that the dissenting justice at the Ohio Supreme Court correctly applied the *Jackson* standard without resorting to "unreasonable interpretations and inferences."  (ECF No. 28, PageID #1431.)  The dissenting justice wrote that "a searchlight should [not] be used to uphold a criminal conviction," and "despite the lead opinion's attempt to find evidence to sustain appellant Sheila McFarland's convictions, they have come up empty-handed."  *McFarland II*, 2020-

24

Ohio-3343, ¶ 54 (Donnelly, J., dissenting).  The dissent emphasized the significance of Motley's testimony while disregarding other evidence presented at trial.  *Id.* at ¶¶ 57–62.

Whatever the State courts may do when they review a conviction, the *Jackson* standard "does not permit [a federal habeas court to engage in] the type of fine-grained factual parsing" on which Petitioner relies.  *Coleman*, 566 U.S. at 655.  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* (quoting *Jackson*, 443 U.S. at 319).  In the end, the question is not whether the State courts' adjudication of the facts presents the best reading of the facts, just whether any rational finder of fact could find guilt beyond a reasonable doubt.  Such is the case here.  The Ohio Supreme Court's analysis is not unreasonable.

*     *     *

For these reasons, the Court **OVERRULES** Petitioner's objections regarding ground two for sufficiency of the evidence and **ADOPTS** the Magistrate Judge's Report and Recommendation regarding ground two.

## II.    Vindictive Sentence (Ground Four)

Petitioner only objected to the recommendation of the Magistrate Judge on her sufficiency of the evidence claim (ground two).  Therefore, the analysis ought to end here.  *See* 28 U.S.C. § 636(b)(1)(C).  However, because of the seriousness of the accusations Petitioner makes against the State trial judge and the length of her sentence, the Court spent additional time and undertook additional effort

notwithstanding Petitioner's failure to make any other objection.  As a result of that effort, the Court is satisfied that the Magistrate Judge correctly determined that ground three (allied offenses) and ground five (jury instruction) present questions of State law, not federal constitutional claims.  Therefore, he correctly recommended that these grounds are not cognizable in a petition for habeas relief.  Further, the Court determines that the Magistrate Judge correctly recognized that Petitioner procedurally defaulted her claim that the State trial court improperly refused to allow a witness to answer a question about whether his testimony was directed by the prosecution (ground one) by failing to present it to the Ohio Supreme Court.  Finally, the Court is satisfied that the Magistrate Judge correctly determined that Petitioner procedurally defaulted her claims for ineffective assistance of trial and appellate counsel (ground six) by failing to present them to the Ohio Supreme Court.  Therefore, the Court does not consider these grounds for relief further.

However, the heart of Petitioner's complaints stem from her sentence and the circumstances under which it was imposed.  Therefore, the Court examines her fourth ground for relief notwithstanding the absence of an objection.  In her fourth ground for relief, Petitioner argues that the State trial judge imposed a vindicative sentence to punish her for her unwillingness to testify against Brownlee and to plead guilty. (ECF No. 1, PageID #14–15.)  In other words, her sentence reflects a penalty for going to trial.  Further, Petitioner contends that the judge gave her a sentence of life to punish her for her behavior at the sentencing hearing.  (*Id.*)  For these reasons, she contends that her sentence violates due process and equal protection.  (*Id.*)

Respondent argues that this ground is not cognizable and, even if expanded to challenge the sentence on grounds other than vindictive sentencing, it would not meet the standard for relief under the AEDPA.  (ECF No. 15, PageID #128–31.)

## II.A.  Clearly Established Federal Law

The Supreme Court has determined that due process prohibits a judge from imposing a vindictive sentence after a defendant successfully challenges a conviction on appeal.  *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969).  Due process requires protection against retaliatory sentencing because "the fear of such vindictiveness may unconstitutionally deter" a defendant from exercising their right to appeal.  *Id*.

"[T]he Supreme Court has had numerous occasions in the last forty years to narrow, clarify and explain the import of *Pearce* in the context of analogous resentencing situations."  *Goodell v. Williams*, 643 F.3d 490, 497 (6th Cir. 2011).  In *Moon v. Maryland*, 398 U.S. 319, 320 (1970), the Supreme Court determined that *Pearce* did not apply where a judge "set[] out in detail the reasons he imposed the . . . sentence" to demonstrate that vindictiveness was not a part of the sentence.  In *Texas v. McCullough*, 475 U.S. 134, 138 (1986), the Supreme Court recognized that the presumption of vindictiveness does not apply every time a defendant received a more severe sentence on retrial.  Rather, such a presumption arises where there is a "need, under the circumstances, to 'guard against vindictiveness in the resentencing process.'"  *McCullough*, 475 U.S. at 138 (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 25 (1973)).

Of particular relevance here, in *Alabama v. Smith,* 490 U.S. 794, 801 (1989), the Supreme Court declined to extend the presumption of vindictiveness to cases

where a sentence imposed after trial was greater than that previously imposed after a guilty plea. The Court reasoned that in the course of a trial "the judge may gather a fuller appreciation of the nature and extent of the crimes charged" and the defendant's conduct may provide insight "into his moral character and suitability for rehabilitation." *Smith*, 490 U.S. at 801. Under *Smith*, a presumption of vindictiveness applies only where there is a "reasonable likelihood" that the increased sentence resulted from actual vindictiveness. *Id.* at 799 (quoting *United States v. Goodwin*, 457 U.S. 368, 373 (1982)). Otherwise, the defendant bears the burden of proving actual vindictiveness. *Id.* at 799–800 (citing *Wasman v. United States*, 468 U.S. 559, 569 (1984)).

### II.B. State Court Adjudication

On direct appeal, the State appellate court identified the presumption of judicial vindictiveness set out in *Pearce*. *McFarland I*, 2018-Ohio-2067, ¶ 50. It observed that at trial Ms. McFarland interrupted a statement by the representative of the victim, interrupted the trial judge, and refused an opportunity for allocution. *Id.* at ¶ 51. Further, the State appellate court observed that Ms. McFarland claimed at trial that her cases were "rigged" and that "she was the victim of a 'racist' judicial system." *Id.* The State appellate court noted that the trial judge "pushed hard for a plea bargain and was annoyed that Brownlee refused to accept one" and applied similar analysis to Ms. McFarland's case:

> As this court found in the codefendant's case, the court "pushed hard for a plea bargain and was annoyed that Brownlee refused to accept one." This [trial] court stated that "[v]iewed in isolation, the consecutive, maximum sentences might be viewed as vindictive." But this court held that the court's "comments cannot be read in isolation from other

remarks it made at sentencing . . . ." "Had the court said nothing about the plea, the murder of a police informant for the purpose of avoiding a drug trafficking prosecution would, by itself, justify a maximum sentence in this case." Thus, this court concluded that it could not "clearly and convincingly conclude that Brownlee's sentence was the product of actual vindictiveness for his refusing to accept the state's plea offer."

*Id.* at ¶ 54.

On this record, the State appellate court determined that "the record shows that the [trial] court mentioned the plea offers that the state had presented to appellant, wherein the state sought to have her testify against Brownlee, not because it was punishing her for not accepting the offers, but in response to appellant's arguing with the court about the facts of the case." *Id.* at ¶ 55. The State appellate court acknowledged the trial judge's frustration with Ms. McFarland but concluded that the sentence was based on the severity of the offense—the murder of a confidential informant—rather than retaliation for going to trial. *Id.* at ¶ 56.

In this regard, the State appellate court's view of the record is not unreasonable. Before imposing sentence, the trial judge told Ms. McFarland: "most importantly, when you manipulate the system of justice by murdering a witness in a criminal trial, you will pay for it with the harshest possible penalty." (ECF No. 15-6, PageID #1326.) Even if over the course of the trial the judge gathered a "fuller appreciation of the nature and extent of the crimes charged" and Ms. McFarland's role in them or greater insight into her "moral character and suitability for rehabilitation," *Smith*, 490 U.S. at 801, that more fulsome knowledge and understanding still led the trial judge at resentencing to the view that the plea bargain "more appropriately reflects her involvement in this case." (Exhibit 1, at 9.)

And he added that he preferred her to take it.  (*Id.*)  Without question, this record leaves a bad taste that the judge imposed a sentence of life in prison because Ms. McFarland refused to testify against Brownlee and insisted on her right to trial. But the State courts considered that view of the facts and arrived at a different view of them.  Not even the dissenting judge took Petitioner's view of the reason for the sentence. *McFarland I*, 2018-Ohio-2067, ¶¶ 68–75 (Stewart, J., dissenting).

For these reasons, Petitioner must point to more than the trial judge's remarks to carry her burden under *Smith* to show a reasonable likelihood that the increased sentence resulted from actual vindictiveness.  Although parts of the record in isolation might not look good, Petitioner has not carried her burden and has not established a violation of due process.

### II.C.  "Exacerbat[ing] an Aggravated Murder"

Both the State appellate court and the Magistrate Judge focused most of their analysis on the State trial court's reference to Ms. McFarland's rejection of a plea bargain.  (ECF No. 15-6, PageID #1324–25; ECF No. 25, PageID #1405–11.)  At sentencing, the trial judge also suggested that Ms. McFarland's decision to file grievances against both him and her attorney "exacerbated an aggravated murder"— a remark that warrants further review.  (ECF No. 15-6, PageID #1325.)  Indeed, counsel specifically raised this remark on direct appeal, claiming that "[t]he judge complained that [Ms. McFarland] filed grievances against both him and her lead counsel.  He even held it against her that Brownlee filed a grievance against him 'and wrote me and told me how unfair I was to everybody.'  Those things, the judge said, 'exacerbated an aggravated murder.'"  (ECF No. 15-1, PageID #226–27.)

30

### II.C.1. Exchange at Sentencing

In its review of the record, the State appellate court analyzed at length the comments of the trial judge, who (1) expressed frustration with Ms. McFarland's rejection of plea bargains; (2) suggested that she should have testified at trial; (3) described her as the most "obnoxious" and "outspoken one of the defendants"; (4) criticized Ms. McFarland for "playing the race card in a disgusting fashion"; and (5) declared his intent to impose a sentence that would "ring out across the state of Ohio and across this country." *McFarland I*, 2018-Ohio-2067, ¶¶ 49–57.  Notably absent from the appellate court's discussion is the following exchange:

> THE COURT:  Just what they do is, they flip the script.  They blame the system.  They blame the cops.  They blame the prosecutors.  Of course they blame the judge.  Right?  It's all about—it's all about the—
>
> THE DEFENDANT:  It's all over that you racist.  It's on the computer.
>
> THE COURT:  Right.  Right.  So then what Sheila does is, she not only rejects the plea bargain—
>
> THE DEFENDANT:  Why would I plea to something I didn't have nothing to do with?
>
> THE COURT:  Then she files a grievance against Don.  She filed a grievance against you, didn't she?
>
> [DEFENSE COUNSEL]:  Yes, she did, judge.
>
> THE COURT:  Then she filed a grievance against me, which was dismissed by the supreme court already.  Then she filed a grievance— then Eddie Brownlee filed a grievance against me and wrote me and told me how unfair I was to everybody.  *So they've exacerbated an aggravated murder*.  And, Sheila, you are the most obnoxious outspoken one of the defendants.  You're even worse than Eddie Brownlee.  And as such, I'm going to hand down the penalty that I want—
>
> THE DEFENDANT:  Life in prison.

> THE COURT:  —that I want to ring out across the state of Ohio and across this country.  And it goes something like this.  When you try to flip the script, when you play the race card in a disgusting fashion, but, most importantly, when you manipulate the system of justice by murdering a witness in a criminal trial, you will pay for it with the harshest possible penalty.  And, therefore, you, Madam, will be sentenced to life in prison without any possibility of parole on Count One.

(ECF No. 15-6, PageID #1324–26) (emphasis added).)

The trial judge's suggestion that Ms. McFarland's grievances "exacerbated an aggravated murder" in isolation might support an argument that he punished her for exercising a legal right.  After all, the Supreme Court has long recognized that punishing an individual for exercising a legal right "is a due process violation of the most basic sort." *Bordenkircher v. Hayes,* 434 U.S. 357, 363 (1978).

As the Magistrate Judge noted, the trial court judge also considered legitimate sentencing factors, such as remorse and acceptance of responsibility—considerations that are not inherently vindictive.  (ECF No. 25, PageID #1408–11); *Smith*, 490 U.S. at 801.  Moreover, on remand, the same trial court judge imposed a less severe sentence:  life in prison with parole eligibility after 20 years, plus an additional three years for the firearm specification.  (ECF No. 19, PageID #1347.)

### II.C.2. Judicial Discretion

Federal law permits federal courts to grant habeas corpus relief only in certain narrow circumstances.  *See* 28 U.S.C. § 2254(d).  "Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably*, it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in

32

reaching outcomes in case-by-case determinations.'" *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Sentencing presents an area where State courts operate with great leeway so long as they do so within the bounds of the law.

Here, Petitioner was convicted of aggravated murder, which carries four possible sentences under Ohio law: life without parole or life with parole eligibility after 20, 25, or 30 years. Ohio Rev. Code § 2929.03(1). Ms. McFarland received a permissible sentence. As the Magistrate Judge noted, a trial judge has discretion to impose a sentence within the bounds of the State's sentencing framework, and the Court may not issue the writ based on a perceived error of State law. (ECF No. 25, PageID #1410–11; *Pulley v. Harris*, 465 U.S. 37, 41 (1984).) The sentence Ms. McFarland received falls within the bounds of the State's sentencing framework.

For all these reasons, the Court determines that Petitioner does not carry her burden to establish that the trial judge's exacerbation remark at sentencing amounts to a violation of due process.

### II.D.  Equal Protection

To the extent Petitioner raises an equal protection argument, she "cannot base a constitutional claim on an argument that [her] case differs from other cases." *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987). Ms. McFarland argues that she received a more serious sentence than those who directly participated in the murder but pled guilty. Sentencing disparities are "an inevitable part of our criminal justice system." *Id.* at 312. While defendants who go to trial might receive a harsher sentence, this outcome does not mean that they are being punished for exercising

33

their rights in an unconstitutional way. *Corbitt v. New Jersey,* 439 U.S. 212, 226 (1978). Put another way, the co-defendants accepted responsibility for the offense. Ms. McFarland did not. Equal protection does not shield a defendant from the consequences of a freely made choice. *Id.*

### II.E. Judicial Bias and Other Claims

To the extent Petitioner seeks to present ground four as a challenge to the bias of the judge who presided at trial and sentenced her, the law forecloses such an argument. Even with liberal construction, the Court is limited by the framing of this ground in the petition. *Martin v. Overton,* 391 F.3d 710, 712 (6th Cir. 2004). And Petitioner did not present this (or any other) ground for relief on the basis of claimed judicial bias.

Further, Petitioner's failure to raise judicial bias on direct appeal precludes the Court from addressing it. *Coleman v. Thompson,* 501 U.S. 722, 731 (1991). "[T]he States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Id.* at 731. The "mere similarity of claims is insufficient to exhaust." *Duncan v. Henry,* 513 U.S. 364, 366 (1995) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971)); *Anderson v. Harless,* 459 U.S. 4, 6 (1982). Therefore, Petitioner has procedurally defaulted this claim.

### II.F. Allegations of Racism and Misconduct

Finally, Petitioner accuses the judge who presided at trial and sentenced her of racism and misconduct. (ECF No. 15-6, PageID #1323–24.) Indeed, the Supreme Court of Ohio suspended the judge who presided over Ms. McFarland's trial for one year after it found 25 judicial conduct violations and four professional conduct

violations in other cases.  *See Disciplinary Couns. v. Gaul*, 175 Ohio St. 3d 12, 2023-Ohio-4751, 239 N.E.3d 192, ¶ 118.  None of those instances of misconduct involved Ms. McFarland or her co-defendants.  In two, the judge coerced plea agreements.  *Id.* at ¶ 105.  The trial judge's pattern of misconduct in other cases undermines the presumption, "which ordinarily presumes honesty and integrity in those serving as adjudicators." *Plumley v. Austin,* 574 U.S. 1127, 135 S. Ct. 828, 828 (2015) (Thomas, J., and Scalia, J., dissenting) (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 891 (2009) (Roberts, C.J., dissenting)) (cleaned up).

Petitioner's allegations are among the most serious that any litigant can levy against a judge.  They implicate and reflect on the integrity of the judicial system as a whole.  Given the severity of those allegations and the potentially serious consequences of them, the Court has taken great pains to review carefully the entirety of the record in this case.  After review of the record, the Court is satisfied that, although the judge may have engaged in misconduct in other matters, none occurred in this case.  To the contrary, Ms. McFarland appears to use the charge of racism as a sword in her fight against the sentence she received.  But the record makes clear that in her case, unlike in others resulting in sanctions or discipline against the State trial judge, Ms. McFarland, not the judge, engaged in misconduct. The record demonstrates as much.  Ms. McFarland questioned the State trial judge's authority, was frequently interruptive, and hurled baseless personal attacks.  (*See, e.g.*, ECF No. 15-6, PageID #1310 & #1314–24.)  Based on its independent review of

the record, the Court determines that Petitioner's allegations of racism and misconduct are unfounded and do not provide grounds for habeas relief either.

*　　*　　*

For these reasons as well as those set forth in the Magistrate Judge's Report and Recommendation, the Court **DENIES** relief on ground four of the petition.

### CERTIFICATE OF APPEALABILITY

Without a certificate of appealability, a habeas petitioner cannot appeal a final order in a habeas proceeding.  28 U.S.C. § 2253(c)(1).  Issuance of a certificate of appealability requires a petitioner to make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This means that the petitioner must show that reasonable jurists could find the district court's determination of the relevant constitutional claims debatable or incorrect.  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004).  The petitioner need not show that the appeal would succeed to be eligible for a certificate of appealability.  *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

In this case, Petitioner's claims lack merit, are not cognizable in habeas corpus, or are procedurally defaulted.  For the claims in the latter two categories, where "a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist [cannot] conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further . . . no appeal is warranted."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Nor does the Court think that reasonable jurists could fairly debate the Magistrate Judge's

36

determination that Petitioner's claims based on allied offenses and the jury instruction are not cognizable in a federal habeas proceeding.

As for the claims on which the Court addresses the merits, Petitioner has not made a substantial showing of the denial of a constitutional right on her sufficiency of the evidence claim.  Her claim for vindictive sentencing presents a closer call. While the Court would welcome further review of the issue, it cannot say that reasonable jurists could fairly debate the denial of relief on the claim given the state of the Supreme Court's jurisprudence.  For these reasons, the Court **DENIES** a certificate of appealability for Petitioner for all grounds for relief.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections (ECF No. 28), **ADOPTS** the Magistrate Judge's Report and Recommendation (ECF No. 25), and **DENIES** and **DISMISSES** the petition for a writ of habeas corpus (ECF No. 1).  Further, the Court **DENIES** a certificate of appealability for all grounds for relief.

**SO ORDERED.**

Dated:  March 31, 2025

_____
     J. Philip Calabrese
     United States District Judge
     Northern District of Ohio